Electronically Filed
Intermediate Court of Appeals
CAAP-17-0000660
11-OCT-2019
08:02 AM

NO. CAAP-17-0000660

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee, v.
ALEXANDER MIRANDA, Defendant-Appellant


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 16-1-0315)


MEMORANDUM OPINION
(By: Fujise, Presiding Judge, Leonard and Chan, JJ.)

Defendant-Appellant Alexander Miranda (**Miranda**) appeals from the Judgment of Conviction and Probation Sentence; Notice of Entry entered on July 12, 2017 (**Judgment**), by the Circuit Court of the First Circuit (**Circuit Court**).[1] Miranda also challenges the Circuit Court's June 16, 2017 Findings of Fact, Conclusions of Law, and Order Denying Motion to Set Aside the Verdict and Enter a Judgment of Acquittal and/or Grant Defendant a New Trial (**Order Denying Motion for New Trial**). Miranda's conviction arises out of an altercation Miranda and his friends, one of whom was Steven Rodriguez (**Rodriguez**), had with two other individuals during a night out drinking in Waikiki. Following a trial by

---

[1] The Honorable Sherri L. Iha presided.

jury, Miranda was convicted of one count of Assault in the Second Degree (**Assault Second**), a violation of Hawaii Revised Statutes (**HRS**) § 707-711(1)(a) and/or HRS § 707-711(1)(b)(2014).[2]

I.  BACKGROUND

On March 2, 2016, Miranda was charged by Felony Information with one count of Assault Second, averring that on or about March 27, 2015, Miranda intentionally, knowingly, or recklessly caused substantial bodily injury to David Metts (**Metts**), a violation of HRS § 707-711(1)(a) and/or HRS § 707-711(1)(b).

A.  Pretrial Matters

1.  Motion to Dismiss

On August 26, 2016, Miranda filed a Motion to Dismiss for Violation of Due Process and Pre-Indictment Delay (**Motion to Dismiss**), arguing that the case must be dismissed as a result of undue delay in the State of Hawaii's (**State's**) filing of the Felony Information, which allegedly resulted in the loss of a surveillance video that was crucial to Miranda's defense. Miranda alleged that the surveillance video would have shown that Metts was the first aggressor in the encounter, that Miranda did not cause substantial bodily injury to Metts, and/or that Miranda acted reasonably in self-defense and/or defense of others.

---

[2]    HRS § 707-711 states, in relevant part:

§ 707-711 **Assault in the second degree.** (1) A person commits the offense of assault in the second degree if:
(a)    The person intentionally or knowingly causes substantial bodily injury to another;
(b)    The person recklessly causes serious or substantial bodily injury to another[.]

2

Miranda's counsel's attached declaration averred that on March 28, 2015, Honolulu Police Department (**HPD**) Detective Michael Burger (**Det. Burger**) was assigned to investigate the incident.  It averred that following the detective's review of investigation reports, his interview of Metts and two other witnesses, Metts's friend Casey Smith (**Smith**) and Miranda's friend Victor Vargas (**Vargas**), photographic lineups shown to Metts and Smith of the alleged assailants, and the interrogation of Miranda and Rodriguez, Det. Burger released Miranda and Rodriguez from police custody.  The Felony Information was filed on March 2, 2016, almost a year from the date of the offense.

A hearing was conducted on the Motion to Dismiss on September 21, 2016.  HPD Officer Arthur Gazelle (**Officer Gazelle**) testified that he responded to an incident on March 27, 2015, that occurred in front of an ABC Store in Waikiki.  He testified that he was able to view surveillance footage from the ABC Store that captured the sidewalk in front of the store from 11:30 p.m. to 11:34 p.m.  Officer Gazelle testified that the video showed two groups of men, some of whom got into an argument.  It appeared to the officer that Miranda was engaged in an argument with another person, when Metts eventually stepped between them. He said that he did not see Metts or Smith attempt to strike Miranda in any way and that he saw Miranda punch Metts.  Officer Gazelle recalled that he observed from that video that about a minute after the first encounter, Miranda and Rodriguez had started to walk away, but Miranda came back and punched Metts one

more time.  At no point did Officer Gazelle observe Smith or Metts engage in fighting.

Officer Gazelle testified that after viewing the video, he asked the ABC Store Assistant Manager, Trisha Vespie (**Vespie**), for a copy of the surveillance footage.  Vespie informed Officer Gazelle that only the supervisor of their loss prevention program could download the footage, so he left an HPD form with Vespie requesting the video.  Vespie said she would forward the form to the supervisor.  On cross-examination, Officer Gazelle testified that he did not have a copy of the form he left with Vespie.

The State submitted an offer of proof with respect to the testimony that would have been offered by Det. Burger regarding his efforts to obtain the surveillance video from the ABC Store.  Det. Burger would have testified that he spoke with Vespie, who told him to contact the loss prevention supervisor Newell Hirata (**Hirata**).  Det. Burger called Hirata three or four times in early to mid-April of 2015, who did not respond.  Det. Burger issued an administrative subpoena for the video, after which time he was told by Hirata that the video had been destroyed due to the company's thirty-day retention policy.

Miranda's counsel represented at the hearing that Hirata would claim that he was never contacted by Det. Burger and he could not find a request for the video.  The Circuit Court offered to continue the hearing so that Miranda could issue a subpoena to Hirata to present this evidence.  Miranda's counsel chose not to continue the hearing and asked to proceed to

argument based on the evidence presented at the hearing because the delay would be too long.

The Circuit Court denied the Motion to Dismiss, stating:

> The Court has considered the evidence presented and notes that the applicable law in -- such as <u>State v. Carvalho</u> establishes that in a due process -- allegation of due process violation, the burden is on the movant to show actual prejudice. And they must establish that by proof that is definite and not speculative in nature to establish actual prejudice. The Court finds that based on the testimony presented, the exhibits, the defendant has not met its burden, so motion is denied.

2.    Motions *in Limine*

On April 7, 2017, the State filed a motion *in limine* seeking, *inter alia*, an order permitting Officer Gazelle to testify as to the contents of the ABC Store's surveillance video. On April 9, 2017, Miranda filed a motion *in limine* seeking, *inter alia*, an order precluding Officer Gazelle from testifying regarding the contents of the video.

A hearing was held on April 10, 2017. The Circuit Court ruled that "the officer will not be allowed to testify to the contents of the video," apparently because there were eyewitnesses to the events that would be testifying at trial. Later in the hearing, Miranda's counsel indicated that Miranda intended to submit into evidence a photograph taken by Officer Gazelle of the surveillance video, which showed Rodriguez, and for which Officer Gazelle had noted that it was a picture of Rodriguez just before he punched Metts's face. The State argued that using the photograph as evidence of what was portrayed in the video would open the door to testimony from Officer Gazelle regarding what he observed in the video. The Circuit Court

5

agreed and advised Miranda's counsel that if the defense used the photo as evidence of what the officer saw in the video or did based on the video, that he would be opening the door for Officer Gazelle's testimony regarding the contents of the video.

B.   Trial

1.   The State's Case

Samuel Wight (**Wight**) testified that on the night of March 27, 2015, he was walking down the street in Waikiki to meet up with some friends.  Wight was walking in the area of the ABC Store on Kalākaua Avenue when he heard shouting.  Wight turned around and saw a group of three individuals yelling at and confronting two individuals.  Wight did not know them.  Wight saw Metts standing with his hands out and palms facing forward.  Wight observed Miranda punch Metts with an uppercut and heard a loud cracking sound.  Metts started spitting blood.  Wight stepped between the two to prevent Metts from getting punched again.  Wight did not see anyone else punch Metts.

Wight spoke to the police officers who responded to the scene.  Approximately ten minutes after law enforcement arrived, an officer showed Wight a lineup, and Wight identified Miranda as the man who punched the victim.  Wight stated he was one-hundred percent positive regarding his identification.  Wight never saw Metts push anyone, put his hands up in a fighting stance, nor touch Miranda or anyone else.

Metts testified that in 2015 he was a United States Marine stationed on O'ahu.  He and his friend Smith were in Waikiki on the night of March 27, 2015, having drinks and waiting

6

for friends.  Metts testified he had consumed about three drinks and he was not drunk.  Smith's arm was injured and in a sling. Metts and Smith were walking down the sidewalk and a group of three males, none of whom were known to Metts, were walking toward them.  As they were crossing paths, Metts turned his shoulder to let them pass by and he was struck on the shoulder by Miranda, which Metts thought was intentional.  It appeared that Smith had been bumped as well.  Metts turned to look at the men, and they had also turned around and began talking about Metts's and Smiths's haircuts, being in the military, and someone called them haoles.  Metts testified that he said, "No.  Stop.  Let's just keep walking.  It's Friday night.  Let's just enjoy our night.  There's no need to do this."  He saw Smith and another member of the group of three close together and it looked as if things might get physical.  As Smith's arm was in a sling, Metts diverted his attention and turned to him and saw his sling get ripped off, and at that time Metts was punched in the jaw.  Metts was confused at first and felt there was something wrong with his mouth.  He looked up to re-orient himself and thought he was struck again but he was not positive.

Metts testified that someone broke up the incident and called the police.  The three males left, and Metts believed Smith followed them.  Metts testified that at no point during the confrontation did he touch Miranda or any of his friends.  Metts identified Miranda and one of his friends in a field lineup prior to leaving for the hospital.  Metts testified that he still feels pain, has depression, anxiety, and headaches from his injury.  He

was bedridden for a year with his jaw wired shut for ten weeks. He also suffers from temporal mandibular joint syndrome.

On cross-examination, defense counsel asked Metts whether he recalled giving a statement to law enforcement that he had shoved someone during the incident.  Metts did not recall giving that statement and testified he was on pain medication at the time.  At trial, he only specifically remembered getting hit once, but in a statement made on the day in question he stated he was hit twice.  In his statement to police, Metts stated two of the three men punched him.  Metts testified that he intended to indicate during the field lineup that the two men he identified, Miranda and Rodriguez, were involved in the fight, but that Miranda is the person who hit him.

An audio recording of Metts was played to refresh Metts's recollection of his interview with Det. Burger at the hospital the night of the incident.  In the interview, Metts stated that there were three individuals in the group that confronted him, and he got punched twice by the same man.  He stated that he was able to identify two of the men, but he could not remember which one had punched him.

On cross-examination, Miranda's counsel attempted to elicit testimony with respect to Metts's knowledge of the Marine Corps's Code of Conduct as follows:

```
Q. Did the Marine Corps have a code of conduct?
A. Yeah.
Q. What is that code of conduct?
A. It's very lengthy.
Q. So, I mean, in terms of how you present
yourself, I guess, to the public.
A. There's a full book of it.
Q. Just give me a little bit of it.
```

```
[STATE]: Objection, Your Honor.
Relevance.
THE COURT: Sustained.
[DEFENSE COUNSEL]:
Q. What's the policy -- what's the code of
conduct on alcohol?
A. I don't know it verbatim.
Q. Just tell me what your recollection is of it.
A. Don't get overly drunk and make a fool of
yourself.
Q. Okay. What are the consequences if you
violate that code of conduct?
[STATE]: Objection. Relevance.
THE COURT: Sustained.
```

At the bench, the defense argued that questions regarding the Code of Conduct were relevant to bias and motive. The Circuit Court found that there was no evidence Metts was overly drunk or acting out. The State also pointed out that Metts was no longer in the Marines and so bias, interest, and motive would be gone. The court did not permit further pursuit of this line of questioning. Defense counsel attempted one more question:

```
Q. What is the Marine code of conduct in terms
of fighting?
[STATE]: Objection, Your Honor.
THE COURT: Sustained.
```

None of Metts's answers were stricken from the record.

Dr. Jerry Beckham (**Dr. Beckham**) testified that he is an emergency medicine physician at Tripler Army Medical Center and was certified as an expert witness with a specialty in emergency medicine. Dr. Beckham treated Metts when he arrived in the emergency department at around 2:00 a.m. on March 28, 2015. Metts told Dr. Beckham that he was hit in the face twice and was complaining of jaw and nose pain. Metts had suffered a fractured jaw in two places. Metts's injuries were consistent with being punched in the mouth.

HPD Officer Riley Saunders (**Officer Saunders**) testified that he was on duty the night of March 27, 2015, and responded to an assault in front of an ABC Store.  When he arrived at the scene, Officer Gazelle was already present.  Officer Gazelle told him an assault had occurred and that male suspects had run from the scene.  Officer Saunders drove down Kalākaua and observed three males running westbound a block away from the incident.  Officer Saunders stopped the men, including Miranda and Rodriguez.  The officer put the three men and a male bystander in a field lineup.  Metts and Wight were shown the same field lineup.  According to Officer Saunders, both Wight and Metts identified Miranda and Rodriguez as men who had hit Metts.

Miranda told Officer Saunders, after Metts identified him, "Officer, to be honest, I did it.  I hit the kid."  Officer Saunders took Rodriguez to the police station for booking.  Rodriguez said he was not injured, but the officer saw him wince when the handcuffs were taken off his right hand, which appeared to be puffy.  The officer took photos of Rodriguez's hand.

Officer Gazelle testified he was on duty the night of March 27, 2015, and was flagged down regarding an assault in front of the ABC Store on Kalākaua Avenue.  He saw Metts walking toward him on the sidewalk, bleeding and holding his face.  He appeared to be dazed and disoriented.  Officer Gazelle also testified that two field lineups were conducted separately for Wight and Metts to make identifications.  Metts identified Miranda and Rodriguez as his assailants, but did not identify which one hit him in the jaw.

Officer Gazelle testified that he viewed surveillance footage from the ABC Store and spoke with Vespie to get a copy of the video. The officer testified that he was not able to get a copy because Vespie was unable to download videos directly from her camera and said that the request would have to go through the ABC Store security department. Officer Gazelle left her an HPD form requesting a copy of the surveillance video, and Vespie said she would forward the request to the security department and arrange for pickup when it was finished. Officer Gazelle did not have a copy of the HPD request form he gave to Vespie.

Miranda's counsel asked Officer Gazelle whether he took a video or photo of the surveillance with his cell phone. Officer Gazelle testified he took a photo.

Det. Burger testified that he is an HPD detective. He was assigned the night of the assault to investigate the incident, and he interviewed Metts at the hospital. Det. Burger believed that Metts was coherent and that the medications he had been given for pain would not affect his interview. Det. Burger contacted the ABC Store directly and they forwarded him to their security officer Hirata, who, the detective was told, was the only person able to provide a copy of the surveillance video. Det. Burger left three phone messages over two weeks for Hirata, but he did not get a response. Det. Burger then obtained an administrative subpoena and sent it to the ABC Store. Hirata received the subpoena and then notified the detective that the footage was saved for only thirty days and had been written over.

11

Det. Burger was not sure whether he or the prosecutor's office retained a copy of the administrative subpoena.

Det. Burger testified that he prepared two photographic lineups containing six photographs, one with Miranda and one with Rodriguez included. Neither Metts nor Smith were able to identify the assailants from the photographic lineups. The detective testified that during the investigation he learned that Rodriguez may have assaulted Metts.

2. The Defense's Case

Miranda testified that he and his friends Rodriguez and Vargas came into Waikiki the night of March 27, 2015, at around 8:00 or 8:30 p.m. They arrived at the zoo parking lot and drank a few beers before taking a walk. Miranda testified that he had about six beers between arriving in Waikiki and approximately 10:00 p.m. Miranda testified that one of his friends was teasing him and pointing to the location where Miranda's ex-girlfriend lived, and they started laughing. They then heard someone say, "What the fuck? What the fuck did you just say to me? I'll fuck you up." They turned around and saw Metts and Smith staring and yelling. He testified that Rodriguez and Metts approached each other, and Metts shoved and grabbed Rodriguez. Miranda said that Metts came toward him, yelling, and that he defended himself by punching Metts once. Miranda claimed he then began to walk away, realized his friends were not following him, and then went back and grabbed Rodriguez, who was in a scuffle with Metts, and then proceeded to walk away. Miranda testified that Smith followed them and continued to yell, and eventually they were stopped by

police. Miranda said he told an officer that he hit Metts in self-defense, but that he was not aware at that time whether anyone else had also hit Metts. Miranda testified that he was not aware that Rodriguez had also hit Metts.

Miranda's counsel sought to admit the photograph taken by Officer Gazelle of the surveillance video. At the bench, the court again cautioned that if the defense admitted the photograph, the State would be allowed to recall Officer Gazelle to testify regarding what he saw in the surveillance video. Miranda's counsel admitted the photograph into evidence, and Miranda testified the photo depicted Rodriguez and Metts.

### 3. The State's Rebuttal

Officer Gazelle testified that he watched the ABC Store surveillance footage that captured approximately 11:30 p.m. to 11:34 p.m. the night of the incident. He testified that he took a photo to get a timestamp of the approximate time of the event. The officer observed what appeared to be Miranda and Rodriguez calling out Metts and Smith, and Metts and Smith had their hands up, signaling that they did not want any trouble. Miranda approached Metts, and Rodriguez approached Smith. Officer Gazelle saw that Miranda threw a punch at Metts, and Rodriguez threw a punch at Smith. Metts and Smith were trying to walk away to avoid the situation. Miranda, Vargas, and Rodriguez then walked away and were out of the video frame for about thirty seconds, and then the officer saw Miranda run back into the frame and punch Metts one last time. Officer Gazelle clarified that Rodriguez and Miranda also engaged with Metts and Smith,

13

respectively, and the photo portrayed that moment. The officer on cross-examination affirmed that Metts received at least two punches, and Smith received one. He did not remember seeing Rodriguez throw a punch at Metts.

    C.    <u>Jury Instructions, Verdict, New Trial Motion & Sentence</u>

As relevant to this appeal, the Circuit Court instructed the jury regarding accomplice liability as follows:

> A defendant charged with committing an offense may be guilty because he is an accomplice of another person in the commission of the offense. The prosecution must prove accomplice liability beyond a reasonable doubt.
> A person is an accomplice of another in the commission of an offense if, with the intent to promote or facilitate the commission of the offense, he aids or agrees or attempts to aid the other person in the planning or commission of the offense.
> Mere presence at the scene of an offense or knowledge that an offense is being committed, without more, does not make a person an accomplice to the offense. However, if a person plans or participates in the commission of an offense with the intent to promote or facilitate the offense, he is an accomplice to the commission of the offense.

The jury found Miranda guilty of Assault Second. Miranda filed a Motion to Set Aside the Verdict and Enter a Judgment of Acquittal and/or Grant Defendant a New Trial (**Motion for New Trial**), based on the following grounds:

> 1.    The evidence adduced at trial did not support finding that the Defendant caused substantial bodily injury to the complaining witness.
> 2.    The evidence adduced at trial did not disprove Defendant's facts or prove facts negating Defendant's self-protection justification defense.
> 3.    The failure to preserve the surveillance video by the police resulted in actual prejudice to the Defendant at trial because there was a dispute between Defendant and Officer Gazelle as to: (i) identity of the principal; (ii) identity of the first aggressor and/or (ii)[sic] number of punches thrown by Defendant.
> 4.    Any additional grounds revealed through further investigation of this matter.

The Motion for New Trial was heard on May 17, 2017, at which time Miranda asserted that an additional basis for a new trial had arisen after trial in that Hirata disclosed he never

14

received an administrative subpoena for the surveillance video. The court orally denied the motion. On June 16, 2017, the Circuit Court filed its Order Denying Motion for New Trial.

On June 24, 2017, Miranda filed Defendant's Statement of Objections to [Order Denying Motion for New Trial] (**Statement of Objections**) and, on July 2, 2017, filed an Addendum to the Statement of Objections (**Addendum**), which had attached thereto a declaration from Hirata.

On July 12, 2017, the Circuit Court entered its Judgment and sentenced Miranda to a term of four years of probation. Miranda timely appealed.

II. POINTS OF ERROR

Miranda raises six points of error on appeal, contending that the Circuit Court erred when it: (1) denied his Motion to Dismiss, because the loss of the surveillance video during the one-year delay before charges were filed against Miranda deprived him of his right to a fair trial; (2) precluded the defense from cross-examining Metts on the Marine Corps's Code of Conduct on alcohol and fighting, because, it deprived him of the opportunity to fully cross-examine Metts; (3) allowed Officer Gazelle to testify about the contents of the ABC Store surveillance video, as the defense did not open the door to the officer's testimony by introducing the photograph taken by Officer Gazelle of the video; (4) instructed the jury on accomplice liability as there was no evidence that Miranda aided and abetted Rodriguez in causing substantial bodily injury to Metts; (5) insufficiently instructed the jury on accomplice

15

liability by failing to define the term "intent to promote or facilitate;" and (6) denied his Motion for New Trial as there was insufficient evidence to convict him and the interests of justice required a new trial based on newly discovered evidence.

III. APPLICABLE STANDARDS OF REVIEW

With respect to a motion to dismiss based on pre-indictment delay, the supreme court has held:

> Both the clearly erroneous and right/wrong tests must be employed in reviewing the circuit court's denial of a motion to dismiss for preindictment delay.  A trial court's [findings of fact] are reviewed under the clearly erroneous standard.  A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made.
> A trial court's conclusions of law are reviewed under the right/wrong standard.  A [conclusion of law] is not binding upon an appellate court and is freely reviewable for its correctness.  [The appellate] court examine[s] the facts and answer[s] the question without being required to give any weight to the trial court's answer to it.

State v. Keliiheleua, 105 Hawai'i 174, 178-79, 95 P.3d 605, 609-10 (2004) (citations and internal quotation marks omitted).

As a general rule, the appellate court reviews evidentiary rulings for abuse of discretion.  Kealoha v. County of Haw., 74 Haw. 308, 319, 844 P.2d 670, 676 (1993).  However, when there can only be one correct answer to the admissibility question, or when reviewing questions of relevance under Hawai'i Rules of Evidence (**HRE**) Rules 401 and 402, the appellate court applies the right/wrong standard of review.  State v. White, 92 Hawai'i 192, 204-05, 990 P.2d 90, 102-03 (1999).  "The trial court's determination that the proffered evidence is probative of bias, interest or motive is reviewed under the right/wrong

standard." State v. Balisbisana, 83 Hawai'i 109, 114, 924 P.2d 1215, 1220 (1996) (citation omitted).

Violation of the constitutional right to confront adverse witnesses is subject to the harmless beyond a reasonable doubt standard. In applying the harmless beyond a reasonable doubt standard the court is required to examine the record and determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction. State v. Acacio, 140 Hawai'i 92, 98, 398 P.3d 681, 687 (2017) (citation omitted).

When jury instructions are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading. State v. Metcalfe, 129 Hawai'i 206, 222, 297 P.3d 1062, 1078 (2013) (citation omitted). "Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial." Id. (citation omitted); see also State v. Nichols, 111 Hawai'i 327, 337, 141 P.3d 974, 984 (2006) ("once instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction").

> When reviewing a post-verdict motion for judgment of acquittal, we employ the same standard that a trial court applies to such a motion, namely, whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the trier of fact, the evidence is sufficient to support a prima facie case so that a reasonable mind might fairly conclude guilt beyond a reasonable doubt. Sufficient evidence to support a prima facie case requires substantial evidence as to every

17

> material element of the offense charged. Substantial evidence as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. Under such a review, we give full play to the right of the fact finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact.

State v. Foster, 128 Hawai'i 18, 25, 282 P.3d 560, 567 (2012) (citations and internal quotation marks omitted).

> [T]he granting or denial of a motion for new trial is within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion. It is well-established that an abuse of discretion occurs if the trial court has clearly exceed[ed] the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant.

State v. Hicks, 113 Hawai'i 60, 69, 148 P.3d 493, 502 (2006) (citation and internal quotation marks omitted). "Furthermore, at a hearing on a motion for new trial, the trial court acts as the trier of fact." Id. at 69-70, 148 P.3d at 502-03 (citation omitted).

> In this jurisdiction, a trial court's FOFs are subject to the clearly erroneous standard of review. An FOF is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction that a mistake has been committed. And where there is substantial evidence, which is credible evidence of sufficient quantity and probative value to justify a reasonable person in reaching conclusions that support the FOFs, the FOFs cannot be set aside. Moreover, an appellate court will not pass upon issues dependent upon credibility of witnesses and the weight of the evidence; this is the province of the trial judge.

Id. at 70, 148 P.3d at 503 (citation omitted). "A trial court's conclusions of law, however, are reviewed de novo, under the right/wrong standard of review." Id. (citation omitted).

IV.    DISCUSSION

    A.    Pre-Indictment Delay/Due Process Claim

        Miranda argues the Circuit Court erred when it denied his Motion to Dismiss because the loss of the surveillance video

18

during the one-year delay before charges were filed against Miranda deprived him of his right to a fair trial.

While the applicable statue of limitations is the "primary guarantee" against the State's assertion of stale criminal trials, a preindictment delay that causes substantial prejudice to a defendant can offend due process. See Keliiheleua, 105 Hawai'i at 179, 95 P.3d at 610. Therefore, the Hawai'i Supreme Court has determined that "[w]hen a defendant alleges a violation of due process based on preindictment delay, the court must employ a balancing test, considering actual substantial prejudice to the defendant against the reasons asserted for the delay." Id. (citation and internal quotation marks omitted).

At the hearing on the Motion to Dismiss, Officer Gazelle testified regarding his efforts to obtain the surveillance video the night of the incident, his unability to obtain a copy, and the referral to the ABC Store's security department. Det. Burger took over the investigation later that night. The State made an offer of proof at the hearing, and Det. Burger testified at trial, that he called Hirata, the ABC Store's loss prevention supervisor, three times in early April of 2015 to obtain a copy of the video, and he eventually obtained an administrative subpoena at the end of April or early May due to the lack of response. Det. Burger was unable to obtain a copy of the video because the ABC Store no longer had the footage by the time Hirata responded to Det. Burger.

Miranda's counsel stated at the hearing that he had contacted Hirata, who would testify that he never heard from the detective and never received the subpoena. The Circuit Court offered to continue the hearing to allow Miranda to subpoena Hirata so the evidence could be presented to support those assertions. Miranda's counsel declined the offer.

The State argues that the loss of the video cannot be prejudicial to Miranda because his argument is speculative, as Officer Gazelle testified as to the contents of the surveillance video. We disagree. There was conflicting testimony regarding the cause and course of the fight, and both the State and Miranda accept that the video captured video footage of the incident. In State v. Dunphy, the supreme court found prejudice to the defendant where taped telephone conversations between the defendant and law enforcement were lost, which compelled the jury to decide whether the defendant was entrapped by law enforcement in those conversations based only on the credibility of witnesses at trial. 71 Haw. 537, 542-43, 797 P.2d 1312, 1315 (1990). As in Dunphy, if the surveillance video had corroborated Miranda's version of events, it may have helped to convince the jury he was acting in self-defense or defense of others, and the destruction thereof would have been prejudicial. Id. at 543, 797 P.3d at 1315 ("Here, it is clear that if the tapes had corroborated appellant's version of the telephone conversations, they would have gone a long way toward convincing the jury that he had established his defense of entrapment, and so the delay which

caused the destruction of the tapes must be deemed to have been prejudicial.").

However, the evidence at the hearing, and at trial, did not establish that the preindictment delay caused actual substantial prejudice to Miranda. The preindictment delay must cause prejudice to the defendant to create a due process violation. See United States v. Marion, 404 U.S. 307, 324 (1971) ("the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial"); Keliiheleua, 105 Hawai'i at 179, 95 P.3d at 610 ("events occurring prior to [the formal criminal charge]" may "cause substantial prejudice to such rights") (citation and internal quotation marks omitted).

There is no indication in the evidence at the hearing or at trial that any delay in investigating the case or lack of diligence by law enforcement (or any other act or non-act attributable to the State) resulted in the loss of the surveillance video. The testimony heard by the Circuit Court was that law enforcement was diligent in its efforts to obtain the video, but law enforcement was unable to do so before the video was lost. Det. Burger testified that he tried to contact Hirata multiple times at the beginning of April 2015 and sent the administrative subpoena at the end of April or beginning of May of 2015. Det. Burger heard back from Hirata shortly after he received the subpoena and learned the video no longer existed. It appears, in fact, that the delay in bringing the charge

21

against Miranda was a result of the State's attempts to obtain the video before making a prosecutorial decision. The court gave Miranda the opportunity to delay the hearing to obtain Hirata as a witness, but he declined. Miranda did not call Hirata as a witness at trial. Accordingly, Miranda did not establish that the preindictment delay caused the loss of the video. Therefore, we conclude that the Circuit Court did not err in denying the Motion to Dismiss.

B.     Cross-Examination Regarding the Code of Conduct

Miranda argues the Circuit Court erred when it precluded the defense from cross-examining Metts on the United States Marine Corps's Code of Conduct on alcohol and fighting in that it deprived him of the opportunity to fully cross-examine Metts. The exchange is set forth above.

As noted earlier, the defense argued that questions regarding the Code of Conduct were relevant to bias and motive, but the Circuit Court found that there was no evidence Metts was overly drunk or acting out. The State also pointed out that Metts was no longer in the Marines at the time of trial and, therefore, bias, interest, and motive related to his status in the Marine Corps would be gone.

"An accused's right to demonstrate the bias or motive of prosecution witnesses is protected by the sixth amendment to the United States Constitution, which guarantees an accused, *inter alia*, the right 'to be confronted with the witnesses against him [or her].'" Acacio, 140 Hawai'i at 98-99, 398 P.3d at 687-88 (quoting Balisbisana, 83 Hawai'i at 115, 924 P.2d at

1221). "Indeed, the main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination[,] . . . [and] the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross examination." Id. at 99, 398 P.3d at 688 (quoting Balisbisana, 83 Hawai'i at 115, 924 P.2d at 1221) (emphasis omitted). HRE Rule 609.1(a) (2016)[3] provides that the credibility of a witness may be attacked by evidence of bias, interest, or motive. "[B]ias, interest, or motive is always relevant under HRE Rule 609.1." Acacio, 140 Hawai'i at 99, 398 P.3d at 688 (citation and emphasis omitted).

The supreme court has established a procedure to determine whether a defendant has been afforded his right to demonstrate bias or motive on the part of a complaining witness. Id. The first step is to determine "whether the jury had sufficient information from which to make an informed appraisal of [the complaining witness's] motives and bias[.]" Id. (citation omitted). Only after the court determines this threshold level of inquiry under the confrontation clause is satisfied, then the second step is triggered, the balancing test to determine whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. Id.

---

[3]     HRE Rule 609.1 states:

   **Rule 609.1  Evidence of bias, interest, or motive.**
   (a) General rule. The credibility of a witness may be attacked by evidence of bias, interest, or motive.
        (b) Extrinsic evidence of bias, interest, or motive. Extrinsic evidence of a witness' bias, interest, or motive is not admissible unless, on cross-examination, the matter is brought to the attention of the witness and the witness is afforded an opportunity to explain or deny the matter.

Here, we conclude that the jury had sufficient information from which to make an informed appraisal of Metts's alleged motives and bias. It was not disputed that an incident occurred between Metts and Miranda and that Miranda punched Metts at least once. Metts claimed Miranda instigated the fight. Miranda claimed that Metts was responsible and he acted only in self-defense and/or defense of others. The jury knew from the evidence that (1) Metts was a Marine at the time of the incident, (2) the Marine Corps has a Code of Conduct, (3) the Code of Conduct has an alcohol policy that provides Marines should not become overly intoxicated. None of this evidence was stricken from the record. The specific code provisions of the Code of Conduct, and Metts's knowledge of those provisions at the time of trial, would not have provided substantially different information than that already in evidence. In addition, at the time of trial, Metts was no longer in the military, so any motive or bias he may have had at the time of the incident with respect to his fear for his military career, was no longer at issue.

We note that this is not a case in which the complaining witness's motive or bias is non-apparent. Cf. State v. Marcos, 106 Hawaiʻi 116, 120-23, 102 P.3d 360, 364-67 (2004) (right of confrontation violated where defendant was precluded from questioning complaining witness regarding pending family court cases concerning custody of their child and possible motive to fabricate charges); Acacio, 140 Hawaiʻi at 100-01, 398 P.3d at 689-90 (right of confrontation violated where defendant was precluded from questioning complaining witness whether she knew

defendant's immigration status and risk of deportation as it raised question of whether she accused defendant of offenses to have him deported and removed from her life); Balisbisana, 83 Hawai'i at 114, 924 P.2d at 1220 (right of confrontation violated where defendant was precluded from questioning regarding complaining witness's previous conviction for harassing defendant and motive for bringing false charges against him). Rather, whatever motive or interest Metts would have had to deflect responsibility for the fight would have been readily apparent to the jury.

For these reasons, we conclude that the jury had sufficient information from which to make an informed appraisal of Metts's motives and bias.

The second question is whether the Circuit Court erred in concluding that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. Acacio, 140 Hawai'i at 99, 398 P.3d at 688; HRE Rule 403. First, the probative information of the contents of the Marine Corps's Code of Conduct was minimal. The jury was informed that the code contained a prohibition on excessive alcohol consumption. There was no evidence at trial that Metts was intoxicated at the time of the incident and at the time of trial Metts was no longer subject to the Code of Conduct. Furthermore, as explained above, whatever motive or bias Metts may have had at the time of the incident was not hidden and would have been apparent to the jury. Any probative value specific to the Marine Corps's Code of Conduct provisions would have been minimal. On the other hand,

25

the danger of unfair prejudice would have been substantial.
Metts testified that he did not know the exact language of the
Code of Conduct. Further attempts to introduce evidence of
specific provisions of the Code of Conduct could have confused
the issues and misled the jury.

"A trial court's balancing of the probative value of
relevant evidence against the prejudicial effect of such evidence
under HRE Rule 403 is reviewed for an abuse of discretion."
State v. Pasene, 144 Hawai'i 339, 362, 439 P.3d 864, 887 (2019)
(citation omitted). We conclude that the Circuit Court did not
abuse its discretion in excluding further inquiry or evidence
into the Marine Corps's Code of Conduct at trial.

C.      Testimony Regarding the Contents of the Video

Miranda argues the Circuit Court erred when it allowed
Officer Gazelle to testify about the contents of the ABC Store
surveillance video, because the defense did not open the door to
the officer's testimony by introducing the photograph at trial.
Miranda does not cite any authority countering the Circuit
Court's conclusion that Miranda opened the door to the testimony
by introducing the photograph. Rather, he argues that due
process ensures that he has a right to be accorded a meaningful
opportunity to present a complete defense, citing State v.
DeLeon, 131 Hawai'i 463, 486, 319 P.3d 382, 405 (2014).[4] Miranda
does not explain how the ruling allowing testimony from Officer

_____

[4] The DeLeon case is inapposite, as in that case the Supreme Court
held that the preclusion of expert testimony from trial regarding the probable
effects of cocaine at the time of a shooting prevented the defendant from
presenting a complete defense. 131 Hawai'i at 486, 319 P.3d at 405.

Gazelle deprived him of a meaningful opportunity to present a complete defense and we cannot conclude that this argument has merit.

It appears that Miranda's argument is in fact based on HRE Rule 1002 and HRE Rule 1004(1), in that he argues that the testimony regarding the contents of the video violated the best evidence rule and did not satisfy any applicable exception thereto.  HRE Rule 1002[5] provides the general rule that in order to prove the content of, *inter alia*, a recording, the original is required except as provided under the rules.  HRE Rule 1004[6] sets forth a number of exceptions to the general rule, one of which provides that an original or duplicate recording is not required, and other evidence of the contents of the recording is admissible, if "[a]ll originals are lost or have been destroyed,

---

[5]    HRE Rule 1002 states:

> **Rule 1002 Requirement of original.**  To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by statute.

[6]    HRE Rule 1004 states:

> **Rule 1004 Admissibility of other evidence of contents.** The original or a duplicate is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if:
>     (1) Originals lost or destroyed. All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith; or
>     (2) Original not obtainable. No original can be obtained by available judicial process or procedure; or
>     (3) Original in possession of opponent. At a time when an original was under the control of the party against whom offered, the party was put on notice, by the pleadings or otherwise, that the content would be a subject of proof at the hearing, and the party does not produce the original at the hearing; or
>     (4) Collateral matters. The writing, recording, or photograph is not closely related to a controlling issue.

unless the proponent lost or destroyed them in bad faith[.]" HRE Rule 1004(1). The supreme court has explained that "HRE Rule 1004(1) is 'particularly suited' to electronic evidence '[g]iven the myriad ways that electronic records may be deleted, lost as a result of system malfunctions, purged as a result of routine electronic records management software (such as the automatic deletion of e-mail after a set time period) or otherwise unavailable[.]'" State v. Espiritu, 117 Hawai'i 127, 134, 176 P.3d 885, 892 (2008) (citation omitted).

Miranda argues that the exception in HRE Rule 1004(1) does not apply because there has been a showing of bad faith by the State in its efforts to secure the video. Miranda cites the Addendum. However, the Circuit Court made its evidentiary ruling well before a declaration was submitted by Miranda. Hirata's declaration was submitted after Miranda moved for a new trial, following the jury's verdict. The Circuit Court gave Miranda the opportunity to subpoena Hirata in order to present his testimony, which Miranda declined. There was no evidence presented at trial that the failure by law enforcement to obtain a copy of the video was in bad faith. Officer Gazelle and Det. Burger both testified to their good faith efforts to obtain a copy of the surveillance video. They were unsuccessful, and the video was erased by the ABC Store. Therefore, the recording was unavailable at trial. Miranda does not identify, and the court does not see, any evidence at trial to support a claim of bad faith, and bad faith cannot be reasonably inferred under the facts of this case. See Espiritu, 117 Hawai'i at 135, 176 P.3d at 893.

Miranda's counsel was warned that if he sought to admit the still photograph of the video, Officer Gazelle would be allowed to testify regarding the video's contents to provide context for the photograph.  Miranda's counsel chose to admit the photograph.  The evidence at trial supported the decision to admit Officer Gazelle's testimony as the video recording was lost and Miranda did not establish bad faith by the State.  We conclude that the Circuit Court did not err in allowing Officer Gazelle to testify regarding the contents of the video.

D.    Accomplice Liability - Sufficiency of the Evidence

Miranda argues the Circuit Court erred when it gave a jury instruction on accomplice liability, as there was no evidence that Miranda aided and abetted Rodriguez in causing substantial bodily injury to Metts.

HRS § 702-222 provides, as relevant here, that

[a] person is an accomplice of another person in the commission of an offense if:
    (1)    With the intention of promoting or facilitating the commission of the offense, the person:
        (a)    Solicits the other person to commit it;
        (b)    Aids or agrees or attempts to aid the other person in planning or committing it[.]

Officer Gazelle testified that he observed on the surveillance video Miranda first hitting Metts in the face.  He recalled that Metts received at least two punches, but he did not recall if one of those punches came from Rodriguez.  He did see that Rodriguez at some point engaged with Metts.  According to Miranda, he first punched Metts in self-defense and later saw Rodriguez and Metts "in a scuffle."  Officer Saunders observed Rodriguez after the incident while transporting him to booking

29

and noticed that his right hand appeared to cause him pain and was puffy. It is undisputed that Metts was punched in the face and suffered substantial injury therefrom. The evidence at trial supports a conclusion that Miranda and/or a combination of Miranda and Rodriguez caused Metts's injuries. There was no testimony that anyone else other than Miranda or Rodriguez physically touched Metts during the incident. There was sufficient evidence from which a jury could have inferred that Miranda aided Rodriguez in the commission of Assault Second.

Regarding the requisite intent, the evidence must support a finding that Miranda had as his conscious objective the bringing about of conduct that the law has declared to be criminal. See State v. Basham, 132 Hawai'i 97, 109, 319 P.3d 1105, 1117 (2014). Miranda argues there was no evidence that he "said anything to indicate that he intended to aid Rodriguez in assaulting Metts." It is unnecessary for Miranda to have vocally or in any specific manner expressed an intent to aid Rodriguez in assaulting Metts. This court has stated:

> [S]ince intent can rarely be proved by direct evidence, proof by circumstantial evidence and reasonable inferences arising from circumstances surrounding the act is sufficient to establish the requisite intent. Thus, the mind of an alleged offender may be read from his acts, conduct and inferences fairly drawn from all circumstances.

State v. White, 10 Haw. App. 263, 265, 865 P.2d 944, 945 (1994) (citations omitted).

The evidence supported a finding that Miranda had as his conscious objective the bringing about of the assault on Metts. Metts testified that he believed Miranda intentionally struck his shoulder while passing him on the sidewalk. Metts

30

testified that he tried to diffuse the situation, but Miranda continued to escalate the situation and eventually threw the first punch. Officer Gazelle testified that he saw the surveillance video and it appeared to him that Miranda and Rodriguez were calling out Metts and Smith. Officer Gazelle testified that Miranda also engaged with Smith, and Rodriguez with Metts. We conclude that the jury could have reasonably inferred from the evidence presented that Miranda solicited Rodriguez or acted to aid Rodriguez with the conscious objective to assault Metts. Miranda's fourth point of error has no merit.

E.    The Accomplice Liability Instruction

Miranda argues the Circuit Court's jury instruction on accomplice liability was insufficient, erroneous, and misleading. The Circuit Court's instruction to the jury regarding accomplice liability is set forth above.

Miranda argues that the failure to define the concept of "intent to promote or facilitate" was an error that mislead the jury, citing Basham, 132 Hawaiʻi 97, 319 P.3d 1105. In Basham, although the jury instructions on accomplice liability were correct, the defendant argued that the prosecutor misstated the law on accomplice liability during closing arguments. Id. at 108-09, 319 P.3d at 1116-17. The prosecutor during closing arguments gave his own interpretation of the meanings of "promote" and "facilitate" in the accomplice liability instruction. The prosecutor argued that "promote" "simply means for our purposes to encourage, the desire to bring about," which was objected to by the defense and overruled by the court. Id.

31

at 108, 319 P.3d at 1116.  The prosecutor also informed the jury that "facilitate" means "to bring about," and the prosecutor stated that the root of the word is "facile," which he defined as "easy or to make easy or to bring about."  Id. at 108-09, 319 P.3d at 1116-17.

The supreme court concluded that the prosecutor in Basham had misstated the law.  First, the court recognized that "promote" and "facilitate" were not defined by statute.  Id. at 109, 319 P.3d at 1117.  The court noted that Hawaii's accomplice liability statute was derived from the nearly identical Model Penal Code (**MPC**) provision, which also did not define the term. Id.  However, the court recognized that the commentary to the relevant MPC section explains that "an accomplice, in having the purpose of promoting or facilitating the commission of the offense, is required to 'have as his [or her] conscious objective the bringing about of conduct that the Code has declared to be criminal.'"  Id. (quoting MPC § 2.06 cmt. (1962)).  Accordingly, the court found that the prosecutor's own definitions "reduced the culpability necessary to satisfy the statutory definition of an accomplice."  Id.

In this case, the jury was properly instructed with respect to the required findings for accomplice liability. Unlike in Basham, the State did not redefine any terms in closing argument.  The State made no specific argument regarding the intent required.

32

Shortly after Basham was decided, the supreme court considered a substantially identical instruction as given in this case, which stated as follows:

> A defendant charged with committing an offense may be guilty because he is an accomplice of another person in the commission of the offense. The prosecution must prove accomplice liability beyond a reasonable doubt.
> A person is an accomplice of another in the commission of an offense if:
>
> 1. With the intent to promote or facilitate the commission of the offense he
> a. solicits the other person to commit it; or
> b. aids or agrees or attempts to aid the other person in the planning or commission of the offense.
>
> Mere presence at the scene . . . of an offense or knowledge that an offense is being committed, without more, does not make a person an accomplice to the offense. However, if a person plans or participates in the commission of an offense with the intent to promote or facilitate the offense, he is an accomplice to the commission of the offense.
>
> A person is not guilty of an offense unless the State proves beyond a reasonable doubt that the person acted with the required states of mind, as these instructions specify, with respect to each element of the offense. The instruction for the offense charged specifies the states of mind required to be proved.

State v. Walton, 133 Hawai'i 66, 89-90, 324 P.3d 876, 899-900 (2014). Of note, no definition of "intent to promote or facilitate" was provided to the jury. The defendant argued that a specific intent instruction should have been included in the instruction. Id. at 90, 324 P.3d at 900. The supreme court disagreed, holding that the "instruction accurately states the law under HRS § 702-222. No further instruction, therefore, was required[.]" Id. The same is true here, as the instruction provided to Miranda's jury was substantively identical to the

language approved by the supreme court in <u>Walton</u>.[7]  We conclude

that Miranda's fifth point of error has no merit.

F.    <u>Motion for New Trial</u>

Miranda argues the Circuit Court erred when it denied

his Motion for New Trial.  Miranda has two main arguments.

First, Miranda argues that there was insufficient evidence to

sustain his conviction.  Second, Miranda argues that a new trial

was required in the interest of justice based on newly discovered

evidence.  We will address each in turn.

With respect to the sufficiency of the evidence to

support a conviction, we must view the evidence at trial in the

strongest light for the prosecution.  <u>State v. Pomroy</u>, 132

Hawai'i 85, 94, 319 P.3d 1093, 1102 (2014).

> The test on appeal is whether substantial evidence
> supports the trier of fact's conclusion.  Substantial
> evidence as to every material element of the offense charged
> is credible evidence which is of sufficient quality and
> probative value to enable a person of reasonable caution to
> support a conclusion.

<u>Id.</u> at 94-95, 319 P.3d at 1102-03 (citations and internal

quotation marks omitted).  "The question of credibility and the

weight to be given the evidence is for the trier of fact to

determine and is not disturbed on appeal."  <u>Id.</u> at 95, 319 P.3d

at 1103 (citation omitted).

---

[7]    We note that after <u>Basham</u> was decided and after Miranda's trial, the Hawai'i Pattern Jury Instructions - Criminal (HAWJIC) were amended by order on May 5, 2017 to include the definition of "intent to promote or facilitate" as "to have the conscious objective of bringing about the commission of (charged offense)."  <u>See</u> HAWJIC Amendments, https://www.courts.state.hi.us/wp-content/uploads/2019/03/05052017_Order_Crim_Jury_Instruct.pdf (last visited September 13, 2019).  Regardless, HAWJIC had not been amended at the time of trial, the HAWJIC are not law, and courts are not bound by the standard instruction.  <u>See</u> <u>Metcalfe</u>, 129 Hawai'i at 231 n.19, 297 P.3d at 1087 n.19.

Miranda argues that there was a lack of "credible evidence" that Miranda caused substantial bodily injury to Metts as a principal or accomplice. He identifies what he believes are inconsistencies in the evidence presented at trial. However, Metts testified that he was walking with Smith in Waikiki when they were confronted by three individuals. Metts testified that Miranda initiated the confrontation, and Metts tried to diffuse the situation but was punched by Miranda. Wight, a disinterested bystander, testified that he saw Miranda punch Metts in the face and heard a loud cracking sound. Wight saw no one else punch Metts. Wight testified that Metts did not push anyone, was not in a fighting stance, and never touched anyone in Miranda's group. Officer Gazelle, who watched the surveillance video that captured the scene, testified that he saw Miranda and Rodriguez call out Metts and Smith, and it appeared to him that Miranda and Rodriguez were instigating the encounter and that Smith and Metts were signaling that they did not want any trouble. He saw Miranda throw a punch at Metts, saw Miranda walk out of the video frame and then thirty seconds later returned and punched Metts one final time. Dr. Beckham testified that Metts suffered a jaw fracture in two places and his injuries were consistent with getting punched in the face. We conclude that there was sufficient evidence at trial to support Miranda's conviction for Assault Second.

Finally, Miranda argues the Circuit Court erred in denying his request for a new trial in the interest of justice

under Hawai'i Rules of Penal Procedure (**HRPP**) Rule 33[8] based on newly discovered evidence. However, the Hirata declaration does not constitute newly discovered evidence.

> A motion for new trial based on newly discovered evidence will only be granted if (1) the evidence has been discovered after trial; (2) such evidence could not have been discovered before or at trial through the exercise of due diligence; (3) the evidence is material to the issues and not cumulative or offered solely for purposes of impeachment; and (4) the evidence is of such a nature as would probably change the result of a later trial.

State v. Mabuti, 72 Haw. 106, 112-13, 807 P.2d 1264, 1268 (1991) (quoting State v. McNulty, 60 Haw. 259, 259, 588 P.2d 438, 440 (1978)). "In determining whether evidence is, in truth, newly discovered and whether sufficient diligence was used to learn of such evidence, the composite knowledge of both the accused and his counsel will be considered." McNulty, 60 Haw. at 268, 588 P.2d at 445, overruled on other grounds by State v. Eberly, 107 Hawai'i 239, 249, 112 P.3d 725, 735 (2005); see also 3 Wright & Miller, Federal Practice and Procedure: Criminal § 584 at 454-55, (4th Ed. 2011). Thus, "evidence known to defendant's counsel before or at trial does not constitute newly discovered evidence justifying [a] new trial." McNulty, 60 Haw. at 268, 588 P.2d at 445 (citations omitted).

---

[8]  HRPP Rule 33 states:

**Rule 33.    NEW TRIAL.**
    The court on motion of a defendant may grant a new trial to the defendant if required in the interest of justice. If trial was by the court without a jury, the court on motion of a defendant for a new trial may vacate the judgment if entered, take additional testimony and direct the entry of a new judgment. A motion for a new trial shall be made within 10 days after verdict or finding of guilty or within such further time as the court may fix during the 10-day period. The finding of guilty may be entered in writing or orally on the record.

Miranda argued that Hirata's averment that he never received an administrative subpoena was new evidence. Hirata's declaration stated that Hirata (1) did not recall and did not have in his records the receipt of phone messages from Det. Burger regarding the surveillance video, (2) did not recall or have any record that reflects the receipt of an administrative subpoena, and (3) the ABC Store does not have a set thirty-day retention policy before the system rewrites over a surveillance video. Even considering the Addendum and Hirata's declaration, we conclude that the Circuit Court did not err in concluding that Miranda did not present "new evidence." During the pre-trial hearing on Miranda's Motion to Dismiss, the issue of HPD's efforts to obtain the surveillance video was at the center. The State submitted an offer of proof regarding Det. Burger's efforts to obtain the surveillance video from Hirata. Miranda offered that Hirata would claim that he was never contacted by Det. Burger and he could not find a request for the video. Miranda declined to continue the hearing so that Hirata could testify. The evidence contained in the Hirata declaration could have been, and in fact was, known to Miranda and counsel prior to trial. Whatever additional facts were contained in the Hirata declaration could have been discovered by the exercise of due diligence. Therefore, we conclude that the Circuit Court did not abuse its discretion in denying the motion.

V.   CONCLUSION

For the reasons set forth above, the Circuit Court's July 12, 2017 Judgment is affirmed.

DATED: Honolulu, Hawai'i, October 11, 2019.

On the briefs:

Dwight C.H. Lum,
for Defendant-Appellant.

Chad Kumagai,
Deputy Prosecuting Attorney,
City and County of Honolulu,
for Plaintiff-Appellee.

Presiding Judge

Associate Judge

Associate Judge